Next case for argument is Sampson v. Kane Is Able. It is docket 19-4095. Counsel are ready for your argument. Good afternoon, your honor. Greg Stevens here on behalf of the appellate. May I please the court? I believe the case should not have been dismissed on a summary judgment motion. There is sufficient evidence that a jury could find both a prima facie case of retaliation and that the reason proffered by Kane for terminating Mr. Sampson, whether you construe it as an actual termination or a constructive termination, is sufficient to present to the jury. The problem that I have is that your client was told to come back to work, didn't come back to work, said, hey, are you coming back to work, and he just didn't show up. I mean, I'm having trouble how a jury can get to the point with saying that he didn't just quit. I think it's fair to read this either as an actual termination or a constructive termination. Well, it's hard to read it as an actual termination when the employer was ready, willing, and able to let him come back to work. I think, though, that a jury could see the fact that they eliminated his position, offered him, after not paying him while he was on suspension, offering him a different position that differed in material ways from the prior position, that a jury could see that as a termination. That's how he saw it, and that's what he said in his deposition is, I believe I was terminated. And I understand you could also, and I think probably more appropriately in this case, look at it as a constructive termination. That's what this is all about. That's why the district court granted summary judgment is because he didn't think you proved a constructive discharge. That is correct. Essentially, it was, you know, you don't have any adverse employment action, which is what you've got to establish for your prima facie case, because there was no termination here. It was essentially a voluntary resignation. And that's what the district court found, but the district court did not consider, in reaching its conclusion that it was a constructive termination, the fact that they stripped him of his supervisory position, stripped him of his supervisory responsibilities. I think he just said, in this case at least, it wasn't significant enough that he, based on the level of supervisory responsibilities, as well as the deduction in pay not being, was a dollar an hour, I think. And the district court basically said, as a matter of law, under the cases that he'd studied, it wasn't, it just didn't constitute constructive discharge. It wasn't sufficiently adverse, essentially. And I think that's the argument. Not adverse. It wasn't. I think the standard is, it's got to be objectively intolerable. Right. And I think that a reasonable person would feel forced to resign, basically. And I don't think the district court got that right. I don't think the district court, my reading of the district court's opinion, it doesn't matter, frankly, because it's been over review, but my reading of the district court's opinion is they didn't really consider the fact that he was stripped of his supervisory responsibilities. They didn't go through the supervisory responsibilities that he had as a lead LTO that he didn't have. What were those? Did he have any actual ability to discipline, hire and fire? He didn't have the ability. He didn't have the ability to hire and fire. He supervised. He told them, the employees, and made them comply with company procedures and policies. He was part of, according to the people who made the decision to terminate him, part of the leadership team. And it says that in his performance evaluation, you're a valued part of the leadership team. He had communications with the client. There is essentially one major client for this warehouse, and they contract with Kane to do their logistics for them. He communicated with the client. He made sure that the employees complied with company policy. He sat in a separate area from the employees. And so what they did when they took those supervisory responsibilities away from him is they put him or they would have put him on a level with the people that he had supervised. Well, now, maybe I'm misunderstanding, but I thought he had some supervisory responsibilities, but he was still essentially a forklift operator. He was still doing the same thing that his employees that he supervised was doing. He just had some additional responsibilities. So in the sense that he would continue to do those same responsibilities as a forklift operator. He would have continued as a forklift operator, but he did see supervisory duties as well. He assigned work. He did training. He ensured compliance with company policy. Right. And he was part of the leadership team. So I don't think the district court didn't consider those. And I think it's appropriate under the case law of the 10th Circuit to consider the fact that this is a demotion, that it is a. But you did not argue as a separate basis for adverse employment action, the demotion or the reduction in pay. We did. Did not. We did. No, you just are solely your only adverse employment action is constructive discharge, right? We are arguing constructive discharge, but part of the constructive discharge or the constructive discharge is the demotion, the reduction in pay. But even if he hadn't been discharged, you could make a separate argument just on adverse employment action of the demotion and the reduction in pay, right? Yes. But you haven't done that. We're just looking at constructive discharge and whether these for your client to continue. Oh, I see what you're. I understand what you're saying is we did not argue that the adverse action was these other things that attended the what we refer to as a constructive discharge. No, we didn't argue that below. We didn't argue it. We mentioned it in the brief because I think it shows part of the causal connection and as well as the hostility towards his continued employment that the court could consider in deciding that there was a constructive discharge is all of these things happened prior to his termination. What is the evidence of retaliation? I thought the demotion was because he had substantiated that he had been rifling through fellow employees, including his supervisor's desk. Seems like a valid basis to have a suspension. It in this case, I think it's reasonable for a jury to decide that it was it was not the suspension and the elimination of his position and the demotion was not in response to that. Those events occurred in April 2016 at the end of April 2016 for one of the beginning for the other one. They were reported to Kane supervisory personnel. Then Mr. Sampson filed his intake questionnaire with the UALD on January, I'm sorry, June 7th, 2016. June 8th, he informed them that he had filed the intake questionnaire. On June 16th, HR department went back and contacted these employees who had previously reported these incidents and said, write statements for us. So it was June 16th after he had filed his initiated his the process with the UALD to raise his claims of discrimination and retaliation that I think that's one of the key pieces of evidence is that it was there's no causal connection between those incidents and his termination. The actual, if at least a jury could reasonably interpret it, the fact that he filed his intake questionnaire and then is charged with discrimination was the reason, the impetus for the suspension. Plus as far as looking at it, I mean you look at the evidence as a whole because there's a lot here. The reason they gave for his elimination of his supervisory responsibilities, the demotion, the reduction in pay, they gave three different reasons. One is the human resources personnel said that it was a disciplinary action, that it was part of the response to his allegedly having gone rifled through people's desks. Another, one of the supervisors said no, we eliminated the position because there was no longer a need for it. And then a third reason for that was that he was not qualified for the position. But even if we agreed with you on these things, that would be going to the prong of the burden shifting analysis that deals with pre-taxed. It would. So you'd first have to get over the first hurdle, which is that there was an adverse employment action in that he was constructively discharged. So if we don't think you've shown enough to get past constructive discharge, we never get to your arguments about pre-tax, do we? I don't know if that's entirely true in this case because I think as one of you at least pointed out during the first argument in the case, you look at the discrimination retaliation case, you look at the evidence as a whole. And so one of the reasons that there is a constructive discharge, which I haven't mentioned, is the hostility towards his claims of discrimination and retaliation. And so when they go back and they look at prior incidents as the basis for his termination, that's hostility towards his claims. When they also give him one of the ACRs, associate counseling reports, on the day, the very day, June 28, 2016, that the charge of discrimination was filed and he informed that it was filed. This is after the intake questionnaire was filed, that they gave him an ACR on that very day. That shows hostility towards his claims of discrimination and retaliation so that they're letting him know that if he continues with making complaints, he's very likely to be terminated because that's what the ACRs say. They don't say because he filed claims, but they say if you don't improve your performance, then you're going to be terminated. Well, wasn't that about not putting a pallet on a truck? It was. And that's at least what... I mean, you're not saying they fabricated that, are you? We are saying that as far as that, yeah, we are saying that that's fabricated. That there was no mix-up in the delivery? Right. On the ACR of June 28, 2016, correct. And we are saying that that was fabricated and that the jury could see that on the very day that he was informed that the charge was formally filed after the intake questionnaire was filed. The jury could see that as retaliatory action. And then two days later, he's in a meeting and allegedly, he rifled through people's records in April and May 2016. Did you contend in district court it was fabricated? We didn't. Yes. As far as the record goes, yes. Well, what do you mean, as far as the record goes? We didn't. There was no argument on the motion for summary judgment. So it was in our opposition to their motion for summary judgment in our memorandum, which is in volume three of the appendix, we did make that argument. I thought you challenged the, my understanding was you challenged whether this was actually a form of discipline. There was a disagreement about whether this was the first step of written discipline or not. Right. But I didn't understand that you challenged the underlying allegation that there had been a mix-up on two different occasions with loading the truck. Right. There was one March 23rd. But we challenged it in the sense that the timing of it made it seem to be retaliatory to us. Okay. So you don't challenge factually that the truck was not properly loaded on two occasions. What you challenge is whether their motive in disciplining him for that was really because he messed up the truck or because they were angry about his complaint. I think that's fair in the memorandum. He, during his deposition, did claim that it was fabricated. I have about a minute 45 if I could reserve that. May it please the court. My name is Kathleen Ware and I represent the appellee. Kane is Abel, Inc. And really this is a case where my client had an employee who made some errors, was disciplined for those errors, and they proceeded to work with and discipline Mr. Sampson as an employee while simultaneously he was raising complaints of discrimination, which the appellant argues began as early as November of 2015, which is for example, he received... Well, do we look at his suspension or do we look at when the activity occurred for which you suspended him? I mean, it is kind of odd that they went back and found this rifling through the desk stuff that had happened sometime previously and then disciplined him for it. And the deposition testimony in the affidavits below demonstrate what had happened was co-worker named Diane Chacon was sitting at her desk when Mr. Sampson approached her and he was looking for a radio. He proceeded to rifle through her desk against her protests. She was saying, she mentioned it to a co-worker and that was sort of where it stayed. They had exchanged that. He had done that. She mentioned it to a co-worker. That co-worker, Ms. Tillery, I believe was her name, then on May 31st when Don Maxwell was out of town, Mr. Sampson was in Mr. Maxwell's office, which is typically locked, rifling through his desk. At that point, she said, okay, that's now two incidents. And so when Mr. Maxwell returned from vacation on June 1, she mentioned for the first time, I saw Mr. Sampson in your office rifling through your desk. And by the way, that's not the first time Diane complained to me, said something about this incident that occurred back in April as well. Then that incident was reported to human resources when they were in the facility, they'd flown out from San Francisco, when they were in the facility investigating Mr. Sampson's claims of discrimination. That's when it was brought up. There's something else that has happened. You should be aware of it. This should be part of the knowledge that you have in your investigation. And then they asked for the statements or the... And it was, yes, at that time, the human resources asked for those statements to be made. They were in the Salt Lake City facility. It had come to their attention on June 15, while they were in the facility about those two prior incidents. So there was two weeks between reporting it to the supervisor whose desk had been gone through and HR being there. What happened in those two weeks? Anything? No. They didn't take any action? They didn't think it was any big deal or? I think Mr. Maxwell conferred with Mr. Curl, the other supervisor in the facility, and the decision was made to bring that to the attention of the human resources department when they were- When they came. At the facility, yes. At the time they suspended him, it was 39 days after he had notified Mr. Cooper, or Ms. Cooper, I think, about the complaint, right? Well, he had notified on June 8th and June 11th, and then again on June 28th. The temporal proximity under our case law, that's enough for at least to look at it carefully, isn't it? I think that temporal proximity should be examined in this case, but I think it should be examined as a whole, which is Mr., again, going back to November of 2015 is when Mr. Sampson began alleging that there was discrimination and retaliation. So it was a full nine months before his suspension. And then during- But he hadn't complained yet to the employment division, right? Well, he, on the March 23rd ACR, he wrote on the back of it, this is discriminatory, this is retaliation. But he didn't yet- In April. Involve a third party administration that could investigate it. That he notified HR, that is correct, in April of 2016 that he felt like he was being discriminated against. That was investigated. Well, it was only a month after his last complaint to the UALD, right? Is that what we should be analyzing the temporal proximity by? Well, this case is, I believe that Mr. Sampson kept restarting the temporal proximity clock. In other words, he's complained on his written form. He's complained in the facility. He complained in April of 2016 to HR. An investigation was conducted. He complained again on May 6th, 2016 to HR. An investigation was conducted. Then on June 7th, 2016, he filed his intake form with the UALD. On June- Isn't there a- I mean, everything's internally at the company. And they can control it through HR and HR investigations. Once he complains outside of the company to the UALD, it's out of the control of the employer. Isn't it reasonable that the employer might view that as something it'd be more upset about than the internal complaint? I don't think so in this case because he had made so many internal complaints that were being handled very seriously by HR. Ms. Cooper, Mr. Alfonso were flying in from Scranton, Pennsylvania, flying in from California to investigate these claims. He had threatened to file with the UALD. He did, in fact, file an intake questionnaire. Not yet his charge of discrimination, just the intake questionnaire, which is a series of questions. And then he notified the very next day Kane, his employer, that he has filed the intake questionnaire. He notified them again on June 11th. They are aware of his claims. They've investigated each and every one of them. And they are also aware that he's pursuing a claim with a state agency. They are letting that progress, but also at the same time not being held hostage by an attorney who basically his complaint isn't you were making up things. You were making up an ACR that I didn't load a pallet. No, he's saying that you're racially discriminating against me. Well, he admitted to the errors, for example, in March, but he's saying I can't be disciplined for them because I'm making a complaint of discrimination. I'm sorry, I thought he was saying maybe I can be disciplined for them, but you're only disciplining me because I'm making a complaint. It's retaliatory. And isn't that his argument? Well, and he also disagrees with what level of discipline it is, as far as I can tell, how serious it is. There is some question about how serious the ACR is. It's a written coaching. But he didn't, for example, he didn't deny that he made errors in failing to get a pallet on a truck. Both instances? Because one of them was his employee, right? That he was responsible for? Weren't there two instances where he made errors? There were two incidents. The first incident was in March of 2016. A pallet failed to get on a truck headed to Georgia. The following day, a pallet failed to get on a truck headed to Pennsylvania. He received an ACR for that. And then on June 28th, a client customer had called and had asked for a response from him. And he was very late in getting back to them, didn't get back to them. That customer called, came to complain. They had a time is of the essence issue and wanted to address it with Mr. Sampson. And he did not get back to him. So there was a complaint from a customer. Can you explain something to me about the facts? He gets his annual performance review on March 28th and gets good to excellent reviews. And it's all glowing. And two hours later, he's presented with the ACR and the counseling. Does that seem inconsistent to you? There's two reasons for that. One, the performance review reviewed his performance through the conclusion of 2015. So to the extent that he received a meets expectations rating for his performance, that accurately reflected his performance that ended in 2015. When was that created? Was that created in March or was that created at the end of the year and then it just sat on a desk for three months? I don't know. I don't know when that document was created off the top of my head. I know that it was reviewed with him in March 23rd and was a meets expectations performance review. The errors happened after they had that performance review. Well, the errors happened after the end of that calendar year. But before they met with him and gave him his performance review. They gave him the performance review on March 28th and the errors, one was March 22nd and I can't remember when. And March 23rd. Yes, that's right. Okay. Yeah. So they knew about these pallet incidents before they sat down and told him that he's on track. He has the abilities to support our team in a successful relationship with our customer, valued member of leadership team, contributes to success, blah, blah, blah. I don't know. I know that the dates 3-22-16 and 3-23-16 were the consecutive days that those errors were made. I don't know when those errors were brought to the attention of Kane. Well, he got his counseling report, the ACR, two hours after his annual review on March 28th. Correct. So in his annual review, he gets told good to excellent. And then two hours later, serious problems. Concerns about the consecutive days where the pallets were not placed on the truck. That's right. And most importantly, though, it is not in dispute that he made those errors, getting the pallets onto the truck, and that that was his job and that it was important that all of the shipment for each one of those trucks be loaded. And he didn't do that. And there's no dispute that he didn't do that. So he did receive a counseling report for that. Was there any evidence that others who acted similarly, that other employees, other forklift operators didn't, who made similar errors, failed to get a pallet on a truck, didn't get the same type of discipline? No, they would have received the same discipline. Was there any evidence one way or the other about that? No, there was not. I'm just wondering how you get to whether you treated him similarly or not. There was no, pardon me, I didn't mean to cut. Go ahead, I'm sorry. There was no evidence that Mr. Sampson was treated dissimilarly from any other employee. If we got to pretext, how should we handle the employer's multiple bases given for removing that lead designation? Well, importantly, these are not, pretext is shown by, that the reason is false. And there's no requirement that there just be one reason. In this situation, in this case, there were three reasons. And depending on, each one of those reasons is consistent. First, he was suspended without pay for going through the desks. He was in a supervisory position. That was an ethical compromise of his job duties. And so HR felt that a one week without pay suspension would be disciplinary. He was also reassigned from the lead forklift operator to just a regular forklift operator. That position was actually eliminated, but for purposes of the HR, they took that position and his pay because he did not, he was not qualified given the ethical breach that he had made by rifling through the desks. Those reasons are entirely consistent with Mr. Maxwell and Mr. Curl who testified that that lead position wasn't justified in the facility because there weren't a number of employees underneath justifying a supervisory position. And that position would be eliminated. They saw an operational reason for elimination of the position. HR saw it as a disciplinary reason. They're both consistent. So all three of the reasons for his termination, excuse me, all three reasons are entirely consistent. And neither one of them is pretext. All right. Thank you very much for your argument. Thank you. I think it is important, as your Honor pointed out, that he filed with an administrative agency outside of the company because that seems to be what triggered the most serious action against him. And this is, you can actually hang your hat on the participation clause rather than just the opposition clause in this case because he actually, by initiating that administrative process, started an action that could be based on participating in a claim of discrimination retaliation with an administrative agency. And it is more threatening to the company. And so I think a jury could find that they took that action when he notified them that it had been filed on June 8, 2016 by going back on June 16 to April and May 2016. That, I think, is the temporal proximity here. I think the ACR is given as sort of a shot across the bow in each case adds to that. But I think if you look at this as he took his most threatening action and they took their most threatening action, that there is, it is reasonable to infer a retaliatory conduct. As far as the March 28 ACR or March 23 ACR, he was actually, he wasn't just handed his performance review. He was in a discussion with them about it and they told him he was doing a fantastic job, not just going back for the year that occurred prior. So you could look at this as Cain wants you to, is they're taking action against him based on an error. But you could also look at it that they're taking action against him based on his filing a complaint. And Mr. Maxwell, the supervisor of the operations center, knew about these claims that he had and chose not to bring it to the attention of anybody, chose not to take any action against Mr. Sampson. It was only after he filed his complaint that the employer took action against him. Thank you. Thank you both for your arguments. The case is submitted and the court will stand in recess until 9 o'clock tomorrow morning.